**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| FAST CAPITAL MARKETING, LLC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-2142 |
| | § | |
| FAST CAPITAL LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

In this contract dispute, Fast Capital Marketing, LLC d.b.a. Merchant Credit Funding

("Merchant Credit") sues Fast Capital, LLC ("Fast Capital"); Goldman Sachs Specialty

Lending Group, L.P.; Rapid Advance Funding 2007-1, LLC d.b.a. Rapid Advance; Strategic

Funding Source, Inc.; and Strategic Funding, LLC. Merchant Credit asserts claims for

breach of contract, misappropriation of trade secrets, unfair competition, unjust enrichment,

and tortious interference, seeking damages, injunctive relief, and certification of a class of

contractors that had similar business arrangements with Fast Capital.

The following motions are pending:

- Merchant Credit moved to expedite discovery, (Docket Entry Nos. 13, 15), and

  Goldman Sachs responded, (Docket Entry No. 16).

- Goldman Sachs moved to dismiss for failure to state a claim on which relief

  can be granted under Rule 12(b)(6), (Docket Entry No. 25). This court held

  a hearing on August 13, 2008 and deferred ruling on the motion to expedite

discovery pending the ruling on the motion to dismiss. (Docket Entry No. 28).

- Rapid Advance, Strategic Funding Source, and Strategic Funding joined in Goldman Sachs's motion to dismiss under Rule 12(b)(6), (Docket Entry Nos. 29, 31); Merchant Credit responded, (Docket Entry Nos. 32, 33); the defendants replied, (Docket Entry Nos. 34, 38, 39); Merchant Credit filed a surreply, (Docket Entry No. 35); Goldman Sachs filed a response and motion to strike the surreply, (Docket Entry No. 36); and Merchant Credit filed a response to the motion to strike, (Docket Entry No. 37).[1]

- After filing an answer to the amended complaint, Fast Capital moved to dismiss Merchant Credit's claims under Rule 12(b)(6), (Docket Entry No. 46), and Merchant Credit responded, (Docket Entry No. 48).

---

[1] In moving to strike the surreply, Goldman Sachs cited *Kozak v. Medtronic, Inc.*, Civ. A. No. H-03-4400, 2006 WL 237000, (S.D. Tex. Jan. 31, 2006), for the proposition that "[a] sur-reply is appropriate by the non-movant only when the movant raises new legal theories or attempts to present new evidence at the reply stage." *Id.* at *4. Goldman Sachs asserts that its reply in support of the motion to dismiss did not raise new legal theories or evidence. Goldman Sachs acknowledges that neither the Federal Rules of Civil Procedure nor this district's local rules expressly require leave to file a surreply. Goldman Sachs argues that this court should nonetheless strike Merchant Credit's surreply for failure to seek leave to file because "customary practice is to seek leave." (Docket Entry No. 36, at 2 n.1). Goldman Sachs cites cases, including *Kozak*, in which courts have stricken surreplies notwithstanding the absence of a rule requiring leave to file. *See, e.g., Longwood Village Restaurant, Ltd. v. Ashcroft*, 157 F.Supp.2d 61, 68 n.3 (D.D.C. 2001); *Groobert v. President and Directors of Georgetown College*, 219 F.Supp.2d 1, 13 (D.D.C. 2002).

Goldman Sachs's reliance on *Kozak* is misplaced. In that case, the plaintiff's initial response to a summary judgment motion did not address several arguments raised by the defendants. 2006 WL 237000, at *4. Two months later, the plaintiff filed a surreply that addressed those arguments for the first time. The defendants claimed that the plaintiff was "sandbagging" them by "withholding summary judgment arguments and evidence . . . until after Defendants had completed their briefing." *Id.* Here, Merchant Credit did attempt to contact this court before filing a surreply despite the fact that the Rules are silent on whether leave is required. Merchant Credit neither "sandbagged" Goldman Sachs nor delayed presenting evidence by filing a surreply. Instead, Merchant Credit made additional arguments about interpreting certain contracts. Goldman Sachs had the opportunity to respond to the arguments made in the surreply by filing a response and had the last word. Goldman Sachs's motion to strike Merchant Credit's surreply is denied.

Based on a careful review of the motions, responses, and replies; the parties' submissions; and the applicable law; this court grants the defendants' motions to dismiss with leave to amend to assert a breach of contract claim for nonpayment of fees and a claim for tortious interference with prospective contractual relationships. The motion to expedite discovery is denied as moot. The reasons for these rulings are explained below. A status conference is set for **January 9, 2009**, at 9:30 a.m., in Courtroom 11-B.

## I.    Background

A consumer credit-card purchase involves a number of transactions and entities. To accept payment by credit card, a merchant contracts with a processing bank to obtain a line of credit.   Credit-card processing banks generally contract with independent sales organizations (ISOs) to sign up merchants on behalf of the bank and provide those merchants with the equipment necessary to receive credit-card payments. Merchants typically submit their sales totals on a daily basis to a payment processor, who in turn transmits the information to the processing bank. The processing bank remits payment, less a commission, to the appropriate merchant through the payment processor. The commissions are divided among the processing bank, the payment processor, and the ISO.

Fast Capital is in the business of purchasing future credit-card receipts at a discount from merchants in exchange for cash. These merchants enter into contracts with Fast Capital under which Fast Capital advances them cash in exchange for a certain amount of credit-card receivables. Merchant Capital provides an example in the amended complaint: Fast Capital

pays a merchant $10,000 for $13,800 in future credit-card receipts, and the merchant's payment processor then remits a percentage of the merchant's daily credit-card receipts to Fast Capital until the $13,800 is paid.

To fund its business, Fast Capital obtained a loan from Goldman Sachs. Fast Capital hired ISOs to solicit merchants to enter into the cash-advance contracts with Fast Capital. Merchant Credit is an ISO. On April 16, 2007, Fast Capital and Merchant Credit entered into two identical ISO Agreements. One engaged Merchant Credit to solicit merchants in the United States and the other engaged Merchant Credit to solicit merchants in Canada. (Docket Entry No. 5, Exs. A, B). The ISO Agreements are governed by New York law. (Docket Entry No. 5, Ex. A at 7). The ISO Agreements describe Fast Capital's "Program" as the contracts between merchants and Fast Capital. Merchant Credit "is in the business of marketing to merchants the products and services of one or more third party payment processors, equipment lessors, and similar parties as a sales and referral agent," and "wishes to promote the Program to merchants and refer merchants to Fast Capital to participate in the Program." (*Id.*). Under the ISO Agreements, Merchant Credit is obligated to "market and promote the program to potential merchant participants; promptly notify Fast Capital in writing of the identity of such merchants that have expressed interest in the Program; assist merchants in completing applications to join the Program . . . and assist Fast Capital in monitoring the compliance by merchants accepted into the Program by Fast Capital with the terms of the Merchant's Agreement." (*Id.*, Ex. A at ¶ 2).

As compensation for soliciting merchants for Fast Capital, Merchant Credit was paid based on a formula set out in the ISO Agreements.  If Merchant Credit solicited a merchant and Fast Capital entered into a contract with that merchant, Merchant Credit received a percentage of the future credit-card receipts, a percentage of all renewals, and commissions on the credit-card transactions by which the merchant's receivables were transferred to Fast Capital.  The ISO Agreements state that "Fast Capital has the sole and exclusive right to determine whether or not to accept a merchant into the program referred by Contractor, or to terminate a Merchant Agreement after its effective date.  Fast Capital has no obligation to pay Compensation to Contractor for merchants referred by Contractor that are not accepted into the Program by Fast Capital." (*Id.*, Ex. A at ¶ 4).  Merchant Credit agreed that during the ISO Agreement term and for two years afterward, it would not "interfere in any manner whatsoever, directly or indirectly, with Fast Capital's relationship with any Merchant . . . cause or attempt to cause any Merchant to terminate its Merchant Agreement;" or "solicit the business of any Merchant for any competitor of Fast Capital or for their own account." (*Id.*, Ex. A at ¶ 8(a)-(c)).

In the amended complaint, Merchant Credit alleges that the merchants it solicited in connection with the Fast Capital ISO Agreements are "the customers of Merchant Credit." (Docket Entry No. 5, at ¶ 11).  Merchant Credit asserts that it "invested significant time and money to develop a customer base concentrated primarily in Texas and Canada." (*Id.* at ¶ 10).  Merchant Credit alleges that Goldman Sachs "took control of the business of Fast

Capital" in June 2008, and is now the "successor in interest to Fast Capital or, alternatively,

exercises control and dominion over Fast Capital so that it 'stands in the shoes' of Fast

Capital with respect to certain contracts of Fast Capital . . . ." (*Id.* at ¶¶ 3, 12). Merchant

Credit alleges that as part of "taking over" Fast Capital, Goldman Sachs took Merchant

Credit's customer list and gave it to Rapid Advance, Strategic Funding Source, and Strategic

Funding. These entities, like Fast Capital, are in the business of paying merchants cash for

future credit-card receivables. Merchant Credit alleges that Goldman Sachs is receiving the

renewal commissions to which Merchant Credit would be entitled had Goldman Sachs not

given the information about the merchants to Rapid Advance, Strategic Funding Source, and

Strategic Funding. Merchant Credit contends that the customer list and other information

about the merchants, which was "developed and compiled by Merchant Credit for its own

business opportunities," (*Id.* at ¶¶ 9, 12), is considered confidential under the ISO

Agreements.

The confidentiality provision in the ISO Agreements states in relevant part:

> Fast Capital and Contractor hereby agree to retain the
> "Confidential Information" of the other in the strictest
> confidence and shall not disclose such information to any person
> other than to such party's agents, employees, Affiliates, officers,
> or directors. Notwithstanding the foregoing, Contractor shall not
> disclose such Confidential information to any entity which is not
> an Affiliate of Contractor. Any "Confidential Information"
> disclosed pursuant to this Agreement shall remain the sole and
> exclusive property of the disclosing party, and the recipient shall
> have no rights or interest with respect thereto. For purposes of
> this Agreement, "Confidential Information" means all
> proprietary, secret or confidential information or data relating to

the business of the disclosing party, the parties to and the terms
and provisions of this Agreement. "Confidential Information"
shall not include: (a) information that is generally known to the
public; (b) information known to the recipient prior to its
disclosure by the disclosing party; or (c) information obtained by
the recipient from a third party not bound by any disclosure
agreement.

(Docket Entry No. 5, Ex. A at ¶ 9).

In the amended complaint, Merchant Credit's breach of contract claim is based on

Goldman Sachs and Fast Capital disclosing to the other defendants: (1) the identities of the

merchants who contracted with Fast Capital; (2) the identities of the merchants who

defaulted on their obligations to transfer future credit-card receivables to Fast Capital; (3) the

identities of the merchants who honored their obligations to Fast Capital; (4) the identities

of the merchants who entered into renewals with Fast Capital; (5) the merchants' relative

profitability; and (6) the merchants Fast Capital viewed as the most desirable for future

business opportunities.  (*Id.* at ¶ 11).  Merchant Credit's misappropriation of trade secrets

claim is also based on the disclosure of this "merchant information" to Rapid Advance,

Strategic Funding Source, and Strategic Funding. Merchant Credit alleges that these entities

are engaging in unfair competition by using the disclosed merchant information to enter into

agreements with these merchants to purchase credit-card receivables.  Merchant Credit's

unjust enrichment, accounting, and restitution claims are based on the allegation that the

defendants have been unjustly enriched by the misappropriation of "Merchant Credit's

customer list and other related and proprietary business information."  Merchant Credit's

tortious interference claim is that the defendants have interfered with Merchant Credit's existing and prospective contractual relationships with merchants selling credit-card receivables, causing Merchant Credit to lose existing accounts as well as renewal accounts.

Goldman Sachs denies that it "took control" of Fast Capital's business. Instead, according to Goldman Sachs, Fast Capital failed to repay its loan, which was collateralized by Fast Capital's assets, including its accounts receivable. Goldman Sachs asserts that it had a perfected security interest in Fast Capital's accounts receivable and was entitled to realize the value of its collateral by providing information about the merchants Fast Capital had contracted with to Rapid Advance, Strategic Funding Source, and Strategic Funding when they were assigned Fast Capital's merchant contracts. Goldman Sachs points out that the ISO Agreements between Fast Capital and Merchant Credit contain an assignment provision stating that Fast Capital may assign its rights and obligations under the merchant contracts without Merchant Credit's consent. (Docket Entry No. 5, Ex. A at ¶ 12(b)). Goldman Sachs asserts that Fast Capital assigned the merchant contracts to Rapid Advance, Strategic Funding Source, and Strategic Funding and that under the assignment agreements, these entities will fulfill Fast Capital's obligations to its ISOs, including Merchant Credit. Goldman Sachs argues that these obligations include paying renewal commissions.

According to Goldman Sachs, Merchant Credit's assertion that it owned the merchant information and had the exclusive right to use it "for its own business opportunities" is contradicted by the ISO Agreements. Goldman Sachs argues that in the Agreements,

Merchant Credit agreed not to "solicit the business of any Merchant for any competitor of Fast Capital or for their own account." (*Id.*, Ex. A. at ¶ 8).

The parties' contentions are examined under the applicable law.

## II.     The Legal Standards

### A.     Dismissal under Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted."[2] FED. R. CIV. P. 12(b)(6). The Supreme Court recently overruled the longstanding rule announced in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1968-69 (2007). Under *Twombly*, a court must not dismiss a complaint for failure to state a claim unless the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 127 S. Ct. at 1974; *Sonnier v. State Farm Mut. Auto. Ins. Co.*, No. 07-30098, 2007 WL 4260892, at *1 (5th Cir. Dec. 6, 2007) (quoting *Twombly*, 127 S. Ct. at 1974); *see also Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007). "[A] plaintiff is obligated to provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

---

[2] Interpretation of a contract is generally suitable for disposition on a motion to dismiss for failure to state a claim upon which relief can be granted because contract interpretation is generally a question of law. *Reinhardt v. Wal-Mart Stores, Inc.*, 547 F.Supp.2d 346, 353 (S.D.N.Y. 2008) (quoting *Revson v. Cinque & Cinque*, 221 F.3d 59, 66 (2d Cir. 2000), and *OBG Technical Servs. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F.Supp.2d 490, 514 (D. Conn. 2007)).

not do.'" *Bradley v. Phillips Petroleum Co.*, No. H-05-3912, 2007 WL 4443876, at *2 (S.D.

Tex. Dec. 18, 2007) (quoting *Twombly*, 127 S. Ct. at 1964–65). "To survive a Rule 12(b)(6)

motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide

the plaintiff's grounds for entitlement to relief – including factual allegations that when

assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*,

503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1964–65); *Sonnier*, 2007

WL 4260892, at *1 (quoting *Twombly*, 127 S.Ct. at 1965). "Conversely, 'when the

allegations in a complaint, however true, could not raise a claim of entitlement to relief, this

basic deficiency should . . . be exposed at the point of minimum expenditure of time and

money by the parties and the court.'" *Cuvillier*, 503 F.3d at 401 (quoting *Twombly*, 127 S.

Ct. at 1966) (quotations omitted). Although material allegations in the complaint must be

accepted as true and construed in the light most favorable to the nonmoving party, a court is

not required to accept conclusory legal allegations cast in the form of factual allegations if

those conclusions cannot reasonably be drawn from the facts alleged. *See Twombly*, 127 S.

Ct. at 1967-70.[3] "If the interpretation of a contract is at issue, a court is 'not constrained to

---

[3] Fast Capital filed a motion to dismiss under Rule 12(b)(6) on October 26, 2008, after it had filed an answer to the amended complaint on August 25, 2008,  (Docket Entry No. 30).  Once a responsive pleading has been filed, a motion to dismiss for failure to state a claim is properly filed as a motion for judgment on the pleadings under Rule 12(c). *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (per curiam).  "'A motion brought pursuant to Fed.R.Civ.P. 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts.'"  *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 439 F.Supp.2d 692, 695 (S.D. Tex. 2006) (quoting *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002)).  The standard of review under Rule 12(c) is the same as that under Rule 12(b)(6).  *Id.*

accept the allegations of the complaint in respect of the construction of the Agreement,'
although all contractual ambiguities must be resolved in the plaintiff's favor." *Banks v.
Correctional Services Corp.*, 475 F.Supp.2d 189, 195 (E.D.N.Y. 2007) (quoting *Int'l
Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

When a plaintiff's complaint must be dismissed for failure to state a claim, the
plaintiff should generally be given at least one chance to amend the complaint under Rule
15(a) before dismissing the action with prejudice. *Great Plains Trust Co.*, 313 F.3d at 329
("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies
before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs
advise the court that they are unwilling or unable to amend in a manner that will avoid
dismissal."). However, a plaintiff should be denied leave to amend a complaint if the court
determines that "allegations of other facts consistent with the challenged pleading could not
possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d
1393, 1401 (9th Cir. 1986) (citation omitted); *see also Great Plains Trust Co.*, 313 F.3d at
329; *Jacquez v. R.K. Procunier*, 801 F.2d 789, 792 (5th Cir. 1996).

## B.    Contract Interpretation

The parties do not dispute that New York law applies. Under that law, construing an
unambiguous contract is a matter of law. *Metro. Life Ins. Co. v. RJR Nabisco Inc.*, 906 F.2d
884, 889 (2d Cir. 1990). A contract is unambiguous if it "has 'a definite and precise
meaning, unattended by danger of misconception in the purport of the [contract] itself, and

concerning which there is no reasonable basis for a difference of opinion.'" *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)).   If a contract is unambiguous, a court is "required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993).   Contractual language whose meaning is otherwise plain "is not made ambiguous simply because the parties urge different interpretations." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992).   However, if the contract language is subject to more than one reasonable interpretation or construction and extrinsic evidence of the parties' intent exists, the proper interpretation is a factual question.   *Consarc Corp.*, 996 F.2d at 573.

"It is axiomatic under New York law that courts interpret a contract so as to give effect to all of its provisions and cannot and should not accept an interpretation that ignores the interplay of the terms, renders certain terms inoperable, and creates a conflict where one need not exist."   *Net2globe International, Inc. v. Time Warner Telecom of New York*, 273 F.Supp.2d 436, 445 (S.D.N.Y. 2003) (internal quotations and citations omitted).   The court's focus in interpreting a contract provision is to give effect to the contracting parties' intentions.   *Metro. Life Ins. Co.*, 906 F.2d at 889.   In ascertaining the purpose or intent of the parties, "lest form swallow substance, [the] goal must be to accord the words of the contract their fair and reasonable meaning." *Sutton v. East River Sav. Bank*, 55 N.Y.2d 550, 555, 450

N.Y.S.2d 460, 435 N.E.2d 1075 (N.Y. 1982) (internal citation omitted).  "Put another way, the aim is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations." *Id.* (internal citation omitted).  If the contract "makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the [agreement]." *Kass v. Kass*, 91 N.Y.2d 554, 567, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998) (internal citation omitted).

## III.   Analysis

Merchant Credit's claims are based on the assertions that the merchant information Fast Capital and Goldman Sachs disclosed to the other defendants is "confidential information" under the ISO Agreements and that Merchant Credit owns the merchant information that it provided to Fast Capital under those Agreements.  The defendants have moved to dismiss Merchant Credit's claims on the grounds that under the terms of the ISO Agreements, the merchant information is not "confidential information" and that Merchant Credit does not own that information.

### A.   The Claims for Breach of Contract and of the Duty of Good Faith and Fair Dealing

Merchant Credit alleges that Goldman Sachs and Fast Capital breached the confidentiality provision of the ISO Agreements by disseminating merchant information to Rapid Advance, Strategic Funding Source, and Strategic Funding.  Under the ISO Agreements, "confidential information" is defined as proprietary, secret, or confidential

information or data relating to the business of the "disclosing party." (Docket Entry No. 5, Ex. A at ¶ 9). The defendants argue that much of the information Fast Capital disseminated – which merchants defaulted on their obligations to transfer future credit-card receivables to Fast Capital, which merchants honored their obligations to Fast Capital, which merchants entered into renewals with Fast Capital, the merchants' relative profitability, and which merchants Fast Capital identified as the most desirable for future business opportunities – does not fall under this definition of "confidential information" because it was not "disclosed" to Fast Capital by Merchant Credit. Instead, Fast Capital asserts that it generated this information itself in the course of its own business. Merchant Credit responds that the merchant information identified in the amended complaint is "clearly confidential information" because it relates to Merchant Credit's business, which includes gathering this type of information. But Merchant Credit acknowledged in its response to the motions to dismiss that the amended complaint "fails to state with particularity the information originally provided by [Merchant Credit] to Fast Capital other than the identities of the merchants." (Docket Entry No. 48). Merchant Credit asserts that in addition to the merchants' identities, it provided Fast Capital with the merchants' banking information, payment processor information, officer/owner names and contact information, social security numbers and/or tax identification numbers, landlord contact information, how long the merchant had been in business, the amount of the merchants' rent, the percentages or fees the merchants' payment processor typically received, and "other information helpful in

evaluating the credit worthiness of the merchant." (Docket Entry No. 48, at 3 n.1). Merchant Credit has requested leave to amend to state this information with particularity. For the reasons explained below, this amendment would not avoid dismissal of the breach of contract claim.

The merchant information that Merchant Credit "originally provided" to Fast Capital as the disclosing party – the identities of the merchants and the additional categories of information Merchant Credit identified in its response – is expressly excluded from the contractual definition of "confidential information." Under the ISO Agreements, "confidential information" is defined to exclude "information obtained by the recipient from a third party not bound by any non-disclosure agreement." (Docket Entry No. 5, Ex. A. at ¶ 9). Merchant Credit obtained the merchant information that it disclosed to Fast Capital from the merchants, who were not bound by a nondisclosure agreement. When the disclosing party – here, Merchant Credit – obtains information from a third party not subject to the nondisclosure agreement – here, the merchants – the disclosed information is not "confidential information" under the ISO Agreements. Merchant Credit's claim that it owns the merchant information because confidential information disclosed under the agreement "shall remain the sole and exclusive property of the disclosing party" is unavailing. Under the unambiguous terms of the ISO Agreements, the information Merchant Credit disclosed that it received from merchants who were not bound by a nondisclosure agreement is not

"confidential information."[4]

"To make out a viable claim for breach of contract a 'complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).  Because the merchant information at issue is not "confidential information" as defined in the ISO Agreements, Merchant Credit cannot state a claim for breach of the contractual confidentiality provision based on Fast Capital or Goldman Sachs disclosing such information to the other defendants.

In response to the motions to dismiss, Merchant Credit asserted two new claims. Merchant Credit alleges that Fast Capital did not pay the 3% "Repayment Fee" required under the ISO agreements.  When Fast Capital entered into a merchant agreement with a merchant referred by Merchant Credit, Fast Capital would pay Merchant Credit an initial fee of 5% of the cash amount Fast Capital advanced to that merchant.  (Docket Entry No. 5, Ex. A at ¶ 3).  When Fast Capital received payment from the merchants in the form of credit-card receipts, Merchant Credit was entitled to 3% of those amounts under the ISO Agreements. (*Id.*).  Merchant Credit alleges that Fast Capital breached the ISO Agreements because it has

---

[4] Even if Merchant Credit disclosed information about the merchants' relative profitability it obtained before entering into the ISO Agreements with Fast Capital, that would not change the analysis.  Merchant Credit obtained this information from the merchants themselves, so it would be excluded from the contractual definition of confidential information as "information obtained by the recipient from a third party not bound by any non-disclosure agreement."

not paid Merchant Credit the Repayment Fees.  Merchant Credit also alleges that Fast Capital

breached its duty of good faith and fair dealing by "releasing the merchant information to its

competitors," knowing that "it would destroy the renewal commissions Merchant Credit

would otherwise earn under the Agreement."  Merchant Credit relies on *Bear, Sterns*

*Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F.Supp.2d 283 (S.D.N.Y. 2005), for the

proposition that "a party may breach the implied covenant of good faith and fair dealing even

if that party's conduct does not contravene the express provisions contained within the four

corners of the written agreement."  *Id.* at 298.

New claims raised for the first time in an opposition brief may be considered as

amendments to the original complaint under Federal Rule of Civil Procedure 15(a).  *See*

*Stover v. Hattiesburg Public School Dist.*, - - - F.3d - - - 2008 WL 4911264, at *12 n. 2 (5th

Cir. Nov. 18, 2008); *Debowale v. U.S. Inc.*, 62 F.3d 395, 395 (5th Cir. 1995); *Cash v.*

*Jefferson Assocs, Inc.*, 978 F.2d 217, 218 (5th Cir. 1992) (a response to a motion to dismiss,

in which plaintiff first alleged that she had been willfully discriminated against, should be

treated as a motion to amend her pleadings).  Rule 15(a) of the Federal Rules of Civil

Procedure provides that a party may amend their pleading once without seeking leave of

court or the consent of the adverse party at any time before a responsive pleading is served.

After a responsive pleading is served, a party may amend only "with the opposing party's

written consent or the court's leave." FED. R. CIV. P. 15(a).  Although "[t]he court should

freely give leave when justice so requires," Rule 15(a)(2), leave to amend "is not automatic."

*Matagorda Ventures Inc. v. Travelers Lloyds Inc. Co.*, 203 F.Supp.2d 704, 718 (S.D. Tex. 2000) (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981)). A district court reviewing a motion to amend pleadings under Rule 15(a) may consider factors such as "whether there has been 'undue delay, bad faith or dilatory motive . . . undue prejudice to the opposing party, and futility of amendment.'" *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998) (quoting *In re Southmark Corp.*, 88 F.3d 311, 314-15 (5th Cir. 1996)). The delay in this case is not "undue." No scheduling order has been entered and there is no showing of dilatory motive or bad faith. The motion for leave to amend to add these claims is granted.

Accepting the new allegations as true, Merchant Credit has stated a viable breach of contract claim for Fast Capital's failure to pay Merchant Credit the 3% repayment fees. However, the breach of the duty of good faith and fair dealing claim is not viable. "'[M]ost courts faced with a complaint brought under New York law and alleging both breach of contract and breach of a covenant of good faith and fair dealing have dismissed the latter claim as duplicative.'" *Bear, Sterns Funding*, 361 F.Supp.2d at 298 (quoting *Network Enterprises, Inc. v. APBA Offshore Productions, Inc.*, 01 Civ. 11765, 2004 WL 1837349, at *4 (S.D.N.Y. Aug. 16, 2004)); *see also OHM Remediation Servs. Corp. v. Hughes Environmental Systems, Inc.*, 952 F.Supp. 120, 124 (S.D.N.Y. 1997); *Canstar v. J.A. Jones Constr. Co.*, 212 A.D.2d 452, 622 N.Y.S.2d 730 (1st Dep't 1995)). "This is because a breach of the implied covenant of good faith and fair dealing is redundant where the conduct

allegedly violating the implied covenant is also the predicate for a claim of breach of an express provision of the underlying contract." *Id.* The basis for Merchant Credit's breach of the implied covenant of good faith and fair dealing is the same as the basis for its breach of contract claim. Both claims are based on the allegation that Fast Capital wrongfully disseminated confidential merchant information to Rapid Advance, Strategic Funding Source, and Strategic Funding. Merchant Credit's breach of the duty of good faith and fair dealing claim is dismissed.

**B.      Misappropriation of Trade Secrets and Unfair Competition**

The defendants moved to dismiss Merchant Credit's claims for misappropriation of trade secrets and unfair competition on the basis that Merchant Credit does not own the merchant information it alleges as the misappropriated trade secret and as the means for the unfair competition. Merchant Credit responds that it has an ownership interest in the merchant information but even if it does not, New York law does not require ownership of protected information to state a claim for trade-secret misappropriation or unfair competition.

**1.      Ownership of Merchant Information under the ISO Agreements**

The defendants contend that Merchant Credit's claim to own the merchant information is contradicted by the terms of the ISO Agreements. The terms of the ISO Agreements prohibit Merchant Credit from selling, purchasing, providing, or exchanging any information about the merchants, "or any information collected or received [under the ISO agreements], to any third party without the prior written consent of Fast Capital." (Docket Entry No. 5,

Ex. A at ¶ 7(c)).  The Agreements also prohibit Merchant Credit from "interfer[ing] in any manner whatsoever, directly or indirectly, with Fast Capital's relationship with any merchant;" from "caus[ing] or attempt[ing] to cause any Merchant to terminate its Merchant Agreement;" and from "solicit[ing] the business of any Merchant for any competitor of Fast Capital or for their own account."  (*Id.* at ¶ 8(a)-(c)).  The defendants argue that these provisions contradict Merchant Credit's claim that it owns the merchant information.  The defendants also point to the assignment provision, which states that Fast Capital may assign its rights and obligations under the ISO Agreements without Merchant Credit's consent but that Merchant Credit may not assign any of its rights, interest, or obligations under the ISO Agreements without Fast Capital's written consent. (*Id.* at ¶ 12(b)).  The defendants contend that interpreting the ISO Agreements to mean that Merchant Credit owns the merchant information would render this provision ineffective and meaningless because Merchant Credit would be able to prevent Fast Capital's assignment of the merchant contracts to a third party.

Merchant Credit argues that these contract provisions do not demonstrate its lack of ownership of the merchant information.  Merchant Credit contends that the prohibition on selling or otherwise disseminating merchant information is only intended to protect Fast Capital from disclosing the merchant information to Fast Capital's competitors and does not show that Fast Capital – as opposed to Merchant Credit – owns the information.  Similarly, Merchant Credit argues that paragraphs 8(a) and 8(b) – which prohibit Merchant Credit from

interfering with Fast Capital's relationship with merchants and causing any merchant to end

its agreement with Fast Capital – only show that Fast Capital has an interest in protecting its

merchant contracts from interference, not that Fast Capital owns the merchant information.

Merchant Credit contends that the ISO Agreements demonstrate that the merchants who

entered into contracts with Fast Capital are Merchant Credit's customers.  Merchant Credit

cites the "Term" provision, which states:

> The "Term" of this Agreement shall be for the earlier of (a) two
> (2) years from the Effective Date and then automatically renew
> for subsequent one (1) year periods unless terminated by either
> party by giving at least one hundred eighty (180) days prior
> written notice, and (b) the date the Agreement is terminated in
> accordance with Section 10 Fast Capital shall be the Contractor's
> exclusive provider of the services contemplated by the Program
> (the "FC Services") to Contractor's merchants for a period of 1
> year.

(Docket Entry No. 5, Ex. A at 1).  Merchant Credit points out that the ISO Agreements refer

to the merchants as "Contractor's merchants."  According to Merchant Credit, the fact that

the ISO Agreements prohibit Merchant Credit from selling the merchant information

supports an inference that it owns the information because "one can[not] sell something one

does not own."  (Docket Entry No. 32, at 6).  Merchant Credit contends that its ownership

of the information is bolstered by the fact that the ISO Agreements do not state that the

merchant information was sold to Fast Capital.  Instead, the ISO Agreements describe the

"referral" of merchants to Fast Capital by Merchant Credit.[5]  According to Merchant Credit,

---

[5] The ISO Agreements state that "Contractor wishes to . . . refer merchants to Fast Capital to
participate in the Program," (Docket Entry No. 5, Ex. A at 1); that "Fast Capital has the sole and exclusive

these provisions show that it owns the merchant information because Fast Capital only had

access to the information through the referrals.  Merchant Credit also points to paragraph 3

of the ISO Agreements, which states that Merchant Credit will be compensated "[i]n

consideration for services rendered," and argues this phrase shows that it provided the

merchant information to Fast Capital as a service and not as part of a sales contract.

Merchant Credit also contends that the termination provision in the ISO Agreements

demonstrates its ownership of the merchant information.  That provision states:

> Upon the termination of the term, (x) for a period of two (2)
> years thereafter, Contractor shall afford Fast Capital an
> opportunity to offer the FC services to Contractor at prices and
> terms substantially similar to (i) bona fide offers by third parties
> to Contractor to perform services similar to the FC Services, or
> (ii) provide funding to Contractor to enable Contractor to
> internally provide services similar to the FC services to
> merchants, and (y) Fast Capital shall have the exclusive right to
> offer FC services to any Merchant in connection with any
> renewals.

(Docket Entry No. 5, Ex. A at 1).  According to Merchant Credit, this provision means that

if an ISO Agreement is terminated, Fast Capital has the right to enter into another ISO

Agreement with Merchant Credit provided that Fast Capital meets any competing offer for

Merchant Credit's services, and if it does, Fast Capital will have the exclusive right to

---

right whether or not to accept a merchant into the Program referred by Contractor," (*Id.*, Ex. A at ¶ 4); that
"Contractor shall be responsible for all of its own business expenses . . . in connection with marketing,
promoting or advertising Fast Capital, the Program and soliciting or referring merchants," (*Id.*, Ex. A at ¶
5(e)); and that Fast Capital granted Merchant Credit "a limited license to use Fast Capital's name, logo,
trademarks, service marks, copyrights, and copyrightable materials . . . in connection with . . . Contractor's
solicitation and referral of merchants to Fast Capital," (*Id.*, Ex. A at ¶ 6).

receive the renewal business of merchants that Merchant Credit originally referred. Merchant Credit contends that Fast Capital's exclusive right to offer renewal services to merchants under clause (y) applies only if Fast Capital has first reached a new agreement with Merchant Credit under clause (x).

Contrary to Merchant Credit's argument, clause (y) – Fast Capital's exclusive right to enter into renewal agreements with merchants – is independent of clause (x). If clause (y) were dependent on clause (x), as Merchant Credit urges, Fast Capital would not be able to enter into renewal agreements with merchants unless it renewed the ISO Agreement with Merchant Credit. This interpretation is contradicted by the ISO Agreement provisions describing the contractual relationships between the merchants and Fast Capital. These contracts are between the merchants and Fast Capital, not Merchant Credit; Fast Capital has the sole right "to determine whether or not to accept a merchant into the Program referred by Contractor; or to terminate a Merchant Agreement after its effective date"; and Merchant Credit cannot "interfere in any manner whatsoever, directly or indirectly, with Fast Capital's relationship with any Merchant." Fast Capital need not enter into a renewed ISO Agreement with Merchant Credit in order to renew its separate agreements with the merchants.

Merchant Credit argues that Fast Capital would not need the exclusivity provision in clause (y) of the ISO agreements unless Merchant Credit owned the merchant information. As the defendants correctly note, clause (y), as well as the clause prohibiting Merchant Credit from selling merchant information, provide Fast Capital with an additional contractual

remedy if Merchant Credit solicits merchants who had contracted with Fast Capital to instead enter into contracts with Fast Capital's competitors.  Interpreting the ISO Agreements to conclude that clause (y) is independent of clause (x) is consistent with paragraph 8(c), which prohibits Merchant Credit from soliciting merchants for its own business purposes for two years after the ISO Agreements end.

Read as a whole, the ISO Agreements do not show that Merchant Credit owns the merchant information.  The facts that the merchants enter into contracts with Fast Capital, not Merchant Credit; that Merchant Credit is prohibited from soliciting these merchants' business for its own account; that the merchant information is not "confidential information"; and that Fast Capital is able to assign the merchant agreements without Merchant Credit's consent, demonstrate that the parties intended that Merchant Credit would be compensated for soliciting merchants for Fast Capital "as a sales and referral agent."  (Docket Entry No. 5, Ex. A at 1).  The ISO Agreements do not show that the parties expected that the merchants solicited by Merchant Credit would "belong" to Merchant Credit or that information about those merchants it solicited to contract with Fast Capital would be used exclusively for Merchant Credit's own "business opportunities."  Interpreting the provisions of the ISO Agreements on which Merchant Credit relies to be consistent with this intent gives meaning to those provisions and avoids making them superfluous.  The term "Contractor's Merchants," as the defendants note, is used to distinguish between the merchants who Merchant Credit referred to Fast Capital from those merchants referred to Fast Capital by

other ISOs. The provisions relating to Merchant Credit's "referral" of merchants to Fast Capital cannot be read in isolation but must be read in conjunction with the provisions prohibiting Merchant Credit from selling the merchant information or using it to solicit merchants "for their own account." When general provisions of a contract are in conflict with more specific provisions, the specific provisions control interpretation and enforcement of the contract. *See DBT Gmbh v. J.L. Min. Co.*, 544 F.Supp.2d 364, 377-78 (S.D.N.Y. 2008). The fact that the ISO agreements mention Merchant Credit's "referral" of merchants to Fast Capital does not override the specific provisions prohibiting Merchant Credit's use and dissemination of merchant information.

Merchant Credit contends that interpreting the ISO Agreements to conclude that it does not own the merchant information ignores the parties' agreement to retain the confidential information of "the other" in strict confidence. Merchant Credit contends that if it does not own the merchant information, then this provision is meaningless because Merchant Credit would have nothing to keep confidential under the ISO Agreements with Fast Capital.

Merchant Credit's interpretation is contradicted by the ISO Agreement provisions stating that any information Merchant Credit obtained from a third party not bound by the nondisclosure agreement and then passed on to Fast Capital is not "confidential information." Merchant Credit's interpretation renders meaningless the provision in the ISO Agreements that information obtained from third parties – such as the merchants – is not "confidential

information." Under the ISO Agreements, "confidential information" means "all proprietary, secret or confidential information or data relating to the business of the disclosing party, the parties to and the terms and provisions of [the] Agreement." (Docket Entry No. 5, Ex. A at ¶ 9). Reading this provision with the provisions defining what is excluded from "confidential information" means that the parties intended to keep confidential the proprietary information each possessed relating to their own businesses, not information about third parties (not under nondisclosure obligations) obtained from those third parties.

Under the unambiguous terms of the ISO agreements, Merchant Credit does not own the merchant information it provided to Fast Capital.

## 2.      Trade Secret Misappropriation

The defendants argue that Merchant Credit has failed to state a claim for misappropriation of trade secrets because it does not own the allegedly misappropriated merchant information. The defendants cite *General Univ'l Sys v. HAL, Inc.*, 500 F.3d 444, 449 (5th Cir. 2007), and *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38 (2d Cir. 1999), for the proposition that a plaintiff must show that it owns a trade secret to state a misappropriation claim. The defendants also argue that Merchant Credit has failed to state a claim because the merchant information is not secret and Merchant Credit did not take measures to protect it from disclosure. Merchant Credit responds that New York law does not require a plaintiff to prove that it owns an allegedly misappropriated trade secret but merely that it possesses the trade secret. *See N. Atl. Instruments*, 188 F.3d at 43-44 (party

must prove that "it possessed a trade secret").  Merchant Credit argues it is clear that it "possessed it [sic] own customer lists, and the information relating to those customers," which it maintains was confidential.  (Docket Entry No. 32, at 10).

Courts applying New York law have consistently stated that a plaintiff must prove that it "*possessed* a trade secret" and have not required proof of ownership.  *See, e.g., Bear, Stearns Funding, Inc.*, 361 F.Supp.2d at 304-05; *Medinol, Ltd. v. Boston Scientific Corp.*, 346 F.Supp.2d 575, 607 (S.D.N.Y. 2004); *Sylmark Holdings Ltd. v. Silicone Zone Int'l, Ltd.*, 5 Misc.3d 285, 297, 783 N.Y.S.2d 758, 770-71 (2004).  Courts confronting the question of whether possession or ownership is required in a trade secrets misappropriation claim have rejected the argument that traditional ownership is required to prevail.  *See, e.g., DTM Research, L.L.C. v. AT & T Corp.*, 245 F.3d 327 (4th Cir. 2001); *DaimlerChrysler Services v. Summit Nat.*, No. 02-71871, 2006 WL 1420812, at *7-8 (E.D. Mich. May 22, 2006) ("for purposes of trade secrets law, the focus is appropriately on the knowledge, or possession, of the trade secret, rather than on mere "ownership" in the traditional sense of the word"); *Cargill, Inc. v. Sears Petroleum & Transport Corp.*, 388 F.Supp.2d 37, 65-66 (N.D.N.Y. 2005) (rejecting argument that possessor, not owner, of trade secret lacked standing to sue for misappropriation of trade secrets); *see also In re Cayman Island Firm of Deloitte & Touche*, 2001 WL 1042233, at *2-3 (Tex. App. – San Antonio 2001, orig. proceeding) (holding that a party who had knowledge of a trade secret through its confidential relationship with affiliated corporation "owned" the secret and could assert a trade secret

privilege under Texas law). Although the holder of a trade secret may be considered as having a property right, *see Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003-04, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984),[6] "[t]he inherent nature of a trade secret limits the usefulness of an analogy to property in determining the elements of a trade-secret misappropriation claim." *DTM Research*, 245 F.3d at 331. The court in *DTM Research* explained:

> The conceptual difficulty arises from any assumption that knowledge can be owned as property. The "proprietary aspect" of a trade secret flows, not from the knowledge itself, but from its secrecy. It is the secret aspect of the knowledge that provides value to the person having the knowledge. . . . While the information forming the basis of a trade secret can be transferred, as with personal property, its continuing secrecy provides the value, and any general disclosure destroys the value. As a consequence, one "owns" a trade secret when one knows of it, as long as it remains a secret. Thus, one who possesses non-disclosed knowledge may demand remedies . . . against those who "misappropriate" the knowledge.

245 F.3d at 331. Under these precedents, the relevant inquiry is not whether Merchant Credit "owned" the merchant information, but whether Merchant Credit knew the merchant information, the information was secret, and Merchant Credit took measures to keep the information secret throughout the parties' dealings.

Under New York law, a party claiming misappropriation of trade secrets must prove

---

[6] The court in *Cargill* noted that "there are cases in which the question of who owns a trade secret is of critical significance." 388 F.Supp.2d at 66. As examples, the court pointed to "the licensing arena, since a prospective licensee is entitled to assurance of adequate protection upon entering into such a license," and "circumstances involving competing claims of entitlement to protect and enforce a trade secret." *Id.* As in *Cargill*, this case does not involve any such circumstance. Fast Capital does not assert that the merchant information is a trade secret that it owns, and the question of ownership is not squarely presented by this case.

that "(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *N. Atl. Instruments*, 188 F.3d at 43-44; *see also Faiveley Transp. Malmo AB v. Wabtec Corp.*, 572 F.Supp.2d 400, 404 (S.D.N.Y. 2008).   New York courts define a "trade secret" as "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *N. Atl. Instruments*, 188 F.3d at 44 (internal quotation marks omitted).   The most important aspect of a trade secret is that it is kept secret. *Ashland Mgmt., v. Janien*, 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993).   The holder of a trade secret must take reasonable steps to keep it secret. *Integrated Cash Mgmt. Services, Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173-74 (2d Cir. 1990).   "A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." *N. Atl. Instruments*, 188 F.3d at 44 (quoting *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir.), *cert denied*, 474 U.S. 844 (1985)); *see also Ikon Office Solutions, Inc. v. Leichtnam*, No. 02-cv-0721, 2003 WL 251954, at *2 n.9 (W.D.N.Y. Jan. 3, 2003) ("For example, personal contracts and spending habits of publicly known entities may nonetheless represent information that is not readily available from a public source of information.") (citing *Props for Today, Inc. v. Kaplan*, 558 N.Y.2d 38, 39 (1st Dep't 1990) (holding that customer lists

containing publicly known entities may nonetheless contain non-public information)); *Bijan Designer for Men, Inc. v. Katzman*, No. 96 Civ. 7345, 1997 WL 65717, at *6 (S.D.N.Y. Feb. 7, 1997) (noting that courts have equated customers' "buying habits, requirements and preferences with 'difficult to obtain information'").

Whether information is a trade secret is often a question of fact. *N. Atl. Instruments*, 188 F.3d at 44; *see also Ashland Mgmt.*, 82  N.Y.2d at 407 (identifying a trade secret is "generally a question of fact"); *Medinol Ltd.*, 346 F.Supp.2d at 607 (determining whether a trade secret exists "can be a fact intensive analysis").[7]  In some cases, however, whether information is a trade secret "may be evident from the pleadings or facts." *Medinol*, 346 F.Supp.2d at 607; *see also Bear, Sterns Funding*, 361 F.Supp.2d at 303-04 (information was not a trade secret because the parties' contract permitted disclosure to third parties).

The facts of *Bear, Sterns Funding* and *North Atlantic Instruments* are instructive.  In *Bear, Sterns Funding*, the plaintiff moved under Rule 12(b)(6) to dismiss a counterclaim for

---

[7] Courts use the following factors to determine whether information constitutes a trade secret:

(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*N. Atl. Instruments*, 188 F.3d at 44 (quoting *Ashland Mgmt.*, 82 N.Y.2d at 407).  These factors are often difficult, if not futile, to apply in the context of a motion to dismiss because they turn on factual considerations gleaned from discovery. *See, e.g.*, *SD Protection, Inc. v. Del Rio*, 498 F.Supp.2d 576, 585-86 (E.D.N.Y. 2007) ("To consider these factors now [on a motion to dismiss] would be premature. . . . . Without discovery, I cannot possibly weigh the six factors discussed in *Ashland* . . . .").

misappropriation of trade secrets.  In that case, the defendant, Interface, had obtained a loan from Bear Sterns secured by a mortgage encumbering real property.  361 F.Supp.2d at 286. The loan agreement Interface signed permitted Bear Sterns to assign or securitize all or part of the loan.  Another provision in the agreement restricted Bear Sterns's right to disclose "the terms of the Loan or any financial information regarding the property," proprietary customer information, or personal information about the chair of Interface's Board.  *Id.* at 286, 303. Interface alleged that Bear Sterns wrongfully disseminated Interface's financial information, which it claimed was a trade secret, when Bear Sterns sold part of the loan to another company.  *Id.* at 303.  The court held that the allegedly confidential financial information was not a trade secret because "far from keeping this information secret, the Loan Agreement ensured that it would be available to any party involved in purchasing a securitization of the loan."  *Id.* at 304.

In *North Atlantic Instruments*, the parties entered into an employment agreement in which the defendant employee acknowledged that his employer was engaged in a specialized business and agreed to keep secret all confidential matters, "including, without limitation, customer lists, trade secrets, pricing policies and other confidential business affairs."  188 F.3d at 41.  While employed at North Atlantic, the defendant had access to "information about North Atlantic's technology and customer base, including lists of customers and contacts with their individual product needs."  *Id.*  The defendant left North Atlantic with computer files containing the customer lists and began working for a competitor who targeted

the same niche market as North Atlantic. *Id.* at 41-42. North Atlantic sought a preliminary injunction enjoining the defendant from contacting the customers on the list. The court held that the customer list was a trade secret. The court emphasized that the list would be difficult to replicate because it reflected individual customer preferences. In addition, North Atlantic had taken steps to keep the list confidential, including limiting access to a few employees and having the defendant agree in his employment contract not to disclose such information. *Id.* at 45-46; *cf. J & L American Enterprises, Ltd. v. DSA Direct, LLC*, 10 Misc. 3d 1076(A), 814 N.Y.S.2d 890, *5 (Table) (2006) (dismissing trade secret misappropriation claim because the plaintiff failed to allege that it informed the defendant employee that it considered customer lists to be secret or that it took measures to protect their confidentiality).

Merchant Credit asserts that it expended significant resources to develop the merchant information at issue. Merchant Credit has not, however, alleged that it informed Fast Capital that the merchant information was secret or that it took any measures to protect the confidentiality of the information. To the contrary, in the ISO Agreements, Merchant Credit agreed that "information obtained by the recipient from a third party not bound by a non-disclosure agreement" was not "confidential information" and that Fast Capital could assign the merchant agreements without Merchant Credit's consent. Such an assignment would necessarily include Fast Capital providing the merchant information to assignees, such as Rapid Advance, Strategic Funding Source, and Strategic Funding.

Merchant Credit has failed to state a claim for misappropriation of trade secrets.

## 2.    Unfair Competition

The defendants contend that Merchant Credit's unfair competition claim is redundant of the trade secret misappropriation claim.   They argue that Merchant Credit's unfair competition claim should be dismissed because "it was essentially unpleaded, with no substantive allegations or discussion related to this claim other than its inclusion in the same title as Merchant Credit's trade secret claim."   (Docket Entry No. 34, at 12).

Unfair competition is a "broad and flexible doctrine" encompassing an "incalculable variety of illegal practices." *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982) (internal quotation marks and citation omitted).   Although New York courts have not explicitly defined all the actions that may qualify as unfair competition, "they have accepted the misappropriation of another's commercial advantage as a cornerstone of the tort of unfair competition."   *Louis Capital Markets, L.P. v. REFCO Group Ltd., LLC*, 801 N.Y.S.2d 490, 494 (2005) (citing *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 671, 439 N.Y.S.2d 858, 422 N.E.2d 518, *rehearing denied*, 54 N.Y.2d 753, 443 N.Y.S.2d 1031, 426 N.E.2d 756 (1981)); *see also LinkCo, Inc. v. Fujitsu Ltd.*, 230 F.Supp.2d 492, 500 (S.D.N.Y. 2002) ("The central principle underlying a claim for unfair competition under New York law is that one may not misappropriate the results of the labor, skill, and expenditures of another.").

If an unfair competition claim is based on the same factual predicate as a claim for misappropriation of trade secrets, the two claims are generally treated as a single cause of

action. *See Abernathy-Thomas Engineering Co. v. Pall Corp.*, 103 F.Supp.2d 582, 599-600 (E.D.N.Y. 2000) (treating misappropriation of trade secrets and unfair competition as stating a single cause of action where the unfair competition claim was based on wrongful disclosure of proprietary information) (citing *CBS Corp. v. Dumsday*, 268 A.D.2d 350, 702 N.Y.S.2d 248, 251 (1st Dep't 2000); *Eagle Comtronics, Inc. v. Pico Prods., Inc.*, 256 A.D.2d 1202, 1203, 682 N.Y.S.2d 505, 506 (4th Dep't 1998)).  An unfair competition claim survives the dismissal of a trade secrets misappropriation claim if the two claims rest on a separate factual basis. In *LinkCo*, 230 F.Supp.2d at 500, the court dismissed the plaintiff's claim for misappropriation of trade secrets but declined to dismiss a separate claim for unfair competition. In addition to the trade secrets claim, the plaintiff had asserted a claim for "investment misappropriation," alleging that the defendant had misappropriated its computer system architecture through secret meetings with the plaintiff's CEO. *Id.*  The trade secrets claim and the unfair competition claim were not duplicative, but rested on different predicates.

Merchant Credit's unfair competition claim is based on the allegedly wrongful dissemination of the merchant information, which Merchant Credit alleges is a trade secret. Because the unfair competition claim "essentially restates" the misappropriation of trade secrets claim, the two rest on the same factual predicate and are properly treated as a single cause of action.  Merchant Credit's separate unfair competition claim is dismissed.

### C.    Unjust Enrichment

A plaintiff may recover for unjust enrichment if it can show that: "(1) defendant was benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006).   Under New York law, "[t]he theory of unjust enrichment lies as a quasi-contract claim.    It is an obligation the law creates in the absence of any agreement." *Id.* at 586-87.   "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter." *Id.* at 587.   However, this rule only applies when the existence of a contract governing the transaction is undisputed. *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 663 (2d Cir. 1996) (the claim for unjust enrichment was "properly pleaded as such in the alternative to the contractual claim" because one defendant disputed being a party to the contract); *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F.Supp.2d 231, 249 (S.D.N.Y. 2006) (unjust enrichment claim survived dismissal because the parties disagreed as to whether the underlying contracts bound the defendants).

The parties do not dispute that the ISO Agreements are valid and enforceable contracts between Merchant Credit and Fast Capital that apply to the transactions at issue. The ISO Agreements preclude Merchant Credit from stating a claim for unjust enrichment against Fast Capital but not as to the other defendants.   Because Goldman Sachs disputes that it "stands in the shoes" of Fast Capital, the ISO agreements do not foreclose Merchant

Credit's unjust enrichment claim against Goldman Sachs.  Nor do the ISO agreements

preclude Merchant Credit from asserting such a claim against Rapid Advance, Strategic

Funding Source, or Strategic Funding, who are not parties to the ISO agreements.

However, a plaintiff claiming unjust enrichment must also show that "'services were

performed *for the defendant* resulting in [the latter's] unjust enrichment,' and the mere fact

that the plaintiff's activities bestowed a benefit on the defendant is insufficient to establish

a cause of action for unjust enrichment." *Clark v. Daby*, 751 N.Y.S.2d 622 (3d. Dep't 2002)

(quoting *Kagan v. K-Tel Entertainment*, 172 A.D.2d 375, 376, 568 N.Y.S.2d 756 (1 Dep'

1991) (emphasis in original)).   Merchant Credit does not allege or argue that it performed

the services under the ISO Agreements for or at the request of Goldman Sachs, Rapid

Advance, Strategic Funding Source, or Strategic Funding. Merchant Credit has failed to state

a claim for unjust enrichment.

**D.     The Tortious Interference Claims**

In the amended complaint, Merchant Credit asserts causes of action for "Tortious

Interference with Existing and Prospective Contractual Relations." (Docket Entry No. 5, at

8).  Merchant Credit alleges:

> Defendants have interfered with Merchant Credit's existing and
> prospective contractual relations by wrongfully utilizing
> Merchant Credit's customer list and other confidential and
> proprietary information to solicit customers Merchant Credit for
> the purpose of inducing them to enter into contracts with
> defendants.   Merchant Credit has been damaged by losing
> existing accounts and losing renewal accounts.  Such tortious
> interference has proximately caused damages to Merchant

Credit in the form of lost income and profits.

(*Id.*).  Goldman Sachs argues that the amended complaint fails to state a claim because Merchant Credit did not have a contractual relationship with the merchants.  Instead, the merchants contracted only with Fast Capital.  (Docket Entry No. 25, at 12).  In response, Merchant Credit asserts that its "primary complaint" is that "Goldman Sachs tortiously interfered with the [ISO] Agreement" by causing "Fast Capital to disseminate the confidential information developed by Merchant to competitors of Fast Capital."  (Docket Entry No. 32, at 14).  Merchant Credit also asserts in response to the motion to dismiss that it has stated a claim for tortious interference with prospective contractual relationships because "[i]f the confidential information had not been disseminated by Fast Capital, at Goldman Sachs' insistence, Merchant could have taken the merchant information and entered into other contracts with entities similar to Fast Capital once Fast Capital had ceased to do business."  (Docket Entry No. 32, at 16).

The elements of tortious interference with a contract are "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1376 (1996). Merchant Credit has failed to state a claim for tortious interference because it has not and cannot allege actual breach of a contract. The dissemination of the merchant information that

Merchant Credit complains about did not breach the confidentiality provisions of the ISO Agreements. *See id.* at 424-25 (complaint did not state a claim for tortious interference if no breach occurred); *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group*, 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492, 496 (1996) (refusing to recognize a tortious interference with contract claim without evidence of breach); *CIBC Bank and Trust Co. Ltd. v. Banco Central de Brasil*, 886 F.Supp. 1105, 1119 (S.D.N.Y. 1995) (holding that under New York law, breach of the underlying contract is a necessary element of tortious interference with contract).

To state a claim of tortious interference with prospective business relations, a plaintiff must establish the following elements: "(i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Scutti Enters., LLC. v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003). Goldman Sachs was a creditor of Fast Capital. It realized the value of its collateral by having Fast Capital assign the merchant agreements to Rapid Advance, Strategic Funding Source, and Strategic Funding. The merchant information is not "confidential information" under the ISO Agreements and Fast Capital had the contractual right to assign its agreements with merchants referred by Merchant Credit without Merchant Credit's consent. Merchant Credit has failed to allege a "wrongful purpose" or "dishonest, unfair, or improper" actions by the defendants.

Merchant Credit's claims for tortious interference are dismissed.

## IV.   Conclusion

The defendants' motions to dismiss are granted.  The motion to expedite discovery is denied as moot.  Because Merchant Credit's claims for breach of the confidentiality provision of the ISO Agreements, breach of the duty of good faith and fair dealing, misappropriation of trade secrets, and unfair competition are dismissed based on the unambiguous terms of the ISO Agreements, "allegations of other facts consistent with the challenged pleading could not possibly cure the deficiency."  An amendment to assert an unjust enrichment claim would similarly be futile because of the existence of the ISO Agreements and the fact that Merchant Credit did not perform services for Goldman Sachs, Rapid Advance, Strategic Funding Source, or Strategic Funding.  Dismissal of these claims is without leave to amend.

Merchant Credit may amend to allege a breach of contract claim against Fast Capital based on nonpayment of fees.  Merchant Credit may also amend its claim for tortious interference with prospective business relations.  As to these claims, the record does not permit the conclusion that amendment would be futile.  The deadline for amendment is January 23, 2009.  A status conference is set for January 9, 2009, at 9:30 a.m.

SIGNED on December 24, 2008, at Houston, Texas.

_Lee H. Rosenthal_

_____

Lee H. Rosenthal
United States District Judge

39